**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

LARYSSA MUNTEAN,

Plaintiff,

v.

ILLINOIS DEPARTMENT OF EMPLOYMENT SECURITY,

Defendant.

NO. 1:24-CV-06178

Judge Edmond E. Chang

**MEMORANDUM OPINION AND ORDER**

Laryssa Muntean resigned from the Illinois Department of Employment Security in June 2022. R. 72, Pl.'s Resp. to DSOF ¶¶ 1, 20; R. 62-1, Def.'s Exh. 1, Muntean Dep. at 22:8–11, 26:20–21; R. 62-6, Def.'s Exh. 6, 06/10/2022 Resignation Email.[1] She then sued the Department for violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, alleging that she faced a hostile work environment and discrimination because of her national origin and sex, and that she was constructively discharged in retaliation for protected activity, R. 1, Compl. ¶¶ 38–78.[2] The Department moves for summary judgment on all claims. R. 60, Def.'s Mot. Because there is no genuine factual dispute that would allow a reasonable jury to find for Muntean, the Department's motion is granted.

---

[1]Citations to the record are "R." followed by the docket entry number and, if needed, a page or paragraph number.

[2]This Court has subject matter jurisdiction over this case under 28 U.S.C. § 1331.

## I. Background

In deciding this summary judgment motion, the Court views the evidence in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Muntean is a first-generation Romanian who identifies as a woman. Pl.'s Resp. to DSOF ¶ 2; Muntean Dep. at 14:4–5, 14:12–15, 58:13–15. In April 2022, she started working in the Department's Wheeling, Illinois office as an Employment Security Program Representative. Pl.'s Resp. to DSOF ¶ 1; Muntean Dep. at 22:8–9, 24:14–17, 25:2–4. There, Muntean says that she was harassed by her coworker, Domingo Martinez. R. 73, Def.'s Resp. to PSOF ¶ 48; Muntean Dep. at 32:10–12. For instance, Martinez once cornered Muntean in the office and tried to write "PR"—or "Puerto Rico"—with a pen on her arm, even though Muntean told Martinez not to touch her. Def.'s Resp. to PSOF ¶ 57; Muntean Dep. at 38:13–39:3, 39:16–17. On several other occasions, Martinez groped or placed his head on Muntean's shoulder. Def.'s Resp. to PSOF ¶¶ 60–61; Muntean Dep. at 44:5–10, 64:6–19. Martinez also made inappropriate comments about sex and relationships to Muntean. Def.'s Resp. to PSOF ¶¶ 62–64; Muntean Dep. at 66:1–20 ("The reason I don't work out is because I have no one to make love to."); Muntean Dep. at 68:7–18 (asking Muntean about her relationship and referring to it as a "situationship"); Muntean Dep. at 117:18–22 (commenting that no one notices anything in the office, so a man could sit in the corner and masturbate, and no one would say anything). When Muntean rebuffed Martinez, she says that he grew more hostile and began to stalk her around the office. Def.'s Resp. to

PSOF ¶ 59; Muntean Dep. at 40:2–18. At some point, Muntean complained about the harassment to her coworker, Darius, as well as to two security guards. Def.'s Resp. to PSOF ¶ 65; Muntean Dep. at 41:11–17.

Muntean also says that she was harassed by Field Office Supervisor Mona Ahmed, who oversaw and assisted the Employment Security Program Representatives at the Wheeling office. Pl.'s Resp. to DSOF ¶¶ 3–4, 8; Def.'s Resp. to PSOF ¶¶ 48, 50; Muntean Dep. at 33:4–7; R. 62-2, Def.'s Exh. 2, Ahmed Dep. at 12:3–5, 13:1–5. Specifically, on June 8, 2022, Muntean says that Ahmed yelled at her and told her she had not done her work properly. Def.'s Resp. to PSOF ¶ 50; Muntean Dep. at 33:4–13, 34:1–4, 36:15–18. Ahmed and Muntean then met with another supervisor in Ahmed's office, where they continued to have an unproductive discussion about Muntean's work performance. Pl.'s Resp. to DSOF ¶¶ 11–12; Ahmed Dep. at 35:10– 36:14. Eventually the meeting ended, Muntean cleaned out her desk, and she left the office at the end of the workday. Pl.'s Resp. to DSOF ¶ 13; Ahmed Dep. at 36:15–21, 37:5–7.

The next day, Muntean emailed Ahmed, Laura Crivlare-Maglio (the manager of the Wheeling office), and Pamela Bowen (a union steward) to request a sick day. Pl.'s Resp. to DSOF ¶ 16; R. 62-5, Def.'s Exh. 5, 06/09/2022 Emails; R. 62-10, Def.'s Exh. 10, D'Ascenzo Dep. at 41:21–42:1. In her email, Muntean said that she had a migraine and nausea because of "bullying, and harassment [she was] experiencing at work." Pl.'s Resp. to DSOF ¶ 16; 06/09/2022 Emails. Crivlare-Maglio

responded that Muntean's "statements regarding bullying and harassment [were] without merit." Def.'s Resp. to PSOF ¶ 80; 06/09/2022 Emails. But Crivlare-Maglio also noted that Muntean could file a complaint with the Equal Employment Opportunity office (which will be called EEO for short), and included contact information for an EEO officer, Anna D'Ascenzo. Pl.'s Resp. to DSOF ¶ 18; 09/2022 Emails.

On June 10, 2022, the following day, Muntean emailed a resignation letter to Crivlare-Maglio, Bowen, and D'Ascenzo. Pl.'s Resp. to DSOF ¶ 20; 06/10/2022 Resignation Email. The resignation letter described Martinez's and Ahmed's harassment of Muntean. Pl.'s Resp. to DSOF ¶ 22; R. 62-7, Resignation Letter. After receiving the resignation letter, D'Ascenzo began investigating Muntean's claims. Pl.'s Resp. to DSOF ¶ 31; R. 62-11, Def.'s Exh. 11, D'Ascenzo Decl. ¶¶ 5–7. On June 13, 2022, Martinez was placed on administrative leave and told that he could have no contact with Muntean until the investigation concluded. Pl.'s Resp. to DSOF ¶¶ 37–38; R. 62-14, Def.'s Exh. 14, 06/13/2022 No Contact Email; R. 62-15, Def.'s Exh. 15, 06/13/2022 Leave of Absence Letter. D'Ascenzo also emailed Muntean several times, encouraging her to withdraw her resignation and asking to speak with her about the alleged harassment. Pl.'s Resp. to DSOF ¶¶ 32, 34; R. 62-12, Def.'s Exh. 12, 06/13/2022 D'Ascenzo Email; R. 62-13, Def.'s Exh. 13, 06/12/2022 D'Ascenzo Email. Muntean never responded or participated in D'Ascenzo's investigation. Pl.'s Resp. to DSOF ¶¶ 33, 35–36, 40; D'Ascenzo Dep. at 41:5–16, 114:9–115:12; D'Ascenzo Decl. ¶ 10. After interviewing various employees, examining personnel files, and considering the allegations in Muntean's resignation letter, D'Ascenzo ultimately concluded that there was

a lack of substantial evidence to support Muntean's claims. Pl.'s Resp. to DSOF ¶¶ 39, 41–47; D'Ascenzo Decl. ¶¶ 8–12.

Muntean then filed a charge with the Equal Employment Opportunity Commission, received a Right to Sue letter, and brought this suit. R. 3, Pl.'s Exh. A, EEOC Charge; R. 3, Pl.'s Exh. B, Right to Sue Letter; Compl.

## II. Legal Standard

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating summary judgment motions, courts must view the facts and draw reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The Court may not weigh conflicting evidence or make credibility determinations, *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011), and must consider only evidence that can "be presented in a form that would be admissible in evidence," Fed. R. Civ. P. 56(c)(2). The party seeking summary judgment has the initial burden of showing that there is no genuine dispute and that they are entitled to judgment as a matter of law. *Carmichael v. Village of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). If this burden is met, the

adverse party must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

## III. Analysis

### A. Hostile Work Environment

To defeat the summary-judgment motion on her hostile work environment claims, Muntean must provide "sufficient evidence to create a material issue of fact as to four elements: (1) the work environment must have been both subjectively and objectively offensive; (2) [her national origin or sex] must have been the cause of the harassment; (3) the conduct must have been severe or pervasive; and (4) there must have been a basis for employer liability." *Montgomery v. Am. Airlines, Inc.*, 626 F.3d 382, 390 (7th Cir. 2010). The Department argues that no reasonable jury could find that Muntean has proven the last three elements, even if the evidence is weighed in Muntean's favor. R. 61, Def.'s Br. at 3–11. The Court addresses each element in reverse order, starting with the basis for employer liability. Then the Court addresses an affirmative defense that the Department asserts. Def.'s Br. at 12–13.

#### 1. Basis for Employer Liability

To show employer liability for a hostile work environment, Muntean must raise a genuine dispute of fact "either (1) that a supervisor participated in the harassment that created the hostile work environment or (2) that [the Department] was negligent in discovering or remedying harassment by [her] coworkers." *Montgomery*, 626 F.3d at 390.

First, Muntean fails to provide any evidence that could lead a reasonable jury to conclude that a supervisor harassed her. Muntean contends that she was harassed by three individuals: Martinez, Ahmed, and Crivlare-Maglio. Def.'s Resp. to PSOF ¶ 48; Muntean Dep. at 32:10–12. Martinez held the same job title as Muntean. Def.'s Resp. to PSOF ¶ 49; Muntean Dep. at 32:19–24. He was not formally a supervisor. Def.'s Resp. to PSOF ¶ 49; Ahmed Dep. at 53:22–54:10. Muntean notes that Martinez sometimes trained and supervised her and other Program Representatives. Def.'s Resp. to PSOF ¶ 49; Muntean Dep. at 33:1–3. In employment-discrimination cases, however, "'supervisor' is a term of art that denotes more than an individual with … some oversight duties." *Montgomery*, 626 F.3d at 390. This requirement of genuine supervisory authority is rooted in the statutory text: discrimination is actionable against an employer only if it discriminates against the employee as to "compensation, terms, conditions, or privileges of employment." 42 U.S.C. § 2000e-2(a)(1). So Martinez's "occasional authority to oversee some aspects of [Muntean's] work does not suffice to make him a supervisor." *Montgomery*, 626 F.3d at 390. Muntean offers no evidence that Martinez could "affect the terms and conditions of" her employment. *Id.* (cleaned up).[3] So there is no basis for a reasonable jury to find that Martinez was Muntean's supervisor.

[3]This Opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

The Department argues that Ahmed also was not a supervisor. Def.'s Br. at 5–6. According to the Department, Ahmed supervised the Program Representatives' work, but she could not control the terms and conditions of their employment. *Id.*; Pl.'s Resp. to DSOF ¶ 4; Ahmed Dep. at 15:22–16:7. In contrast, Muntean presents some evidence that Ahmed had supervisory powers. *See* R. 71, Pl.'s Resp. Br. at 6; Pl.'s Resp. to DSOF ¶ 3; Muntean Dep. at 25:5–11 (stating that Ahmed directly supervised Muntean); Ahmed Dep. at 17:4–14 (describing how Ahmed evaluated the Program Representatives and played a role in disciplining them); *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 506 (7th Cir. 2004) (describing how supervisors must have "the authority to hire, fire, promote, demote, *discipline*, or transfer" supervisees (emphasis added)), *overruled in part on other grounds by Ortiz v. Warner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). But neither party offers detailed evidence about Ahmed's specific powers over the Program Representatives. Ultimately, the Court need not decide whether a reasonable jury could find that Ahmed was a supervisor. As described in the next subsections, Muntean raises no genuine dispute of fact over whether Ahmed's conduct was severe or pervasive, whether her conduct was because of Muntean's national origin or sex, or whether the Department can assert an affirmative defense about Ahmed's conduct. *See infra* Sections III.A.2–4. Thus, even assuming that Ahmed was a supervisor, her conduct was not actionable under Title VII.

The same goes for Crivlare-Maglio. She was undisputedly a supervisor. Pl.'s Resp. to DSOF ¶ 5; Muntean Dep. at 25:5–11; R. 62-3, Def.'s Exh. 3, Crivlare-Maglio Decl. ¶¶ 2–3. But Muntean offers no evidence that Crivlare-Maglio *herself* engaged

in any harassment. *See* Def.'s Resp. to PSOF ¶¶ 67–68; Muntean Dep. at 44:14–45:21 (attesting only that Crivlare-Maglio knew about Martinez's and Ahmed's harassment and did nothing). So Crivlare-Maglio's conduct itself offers no basis for employer liability. Because Muntean "offered no evidence of harassment from *supervisors* at [the Department], [s]he has not established a material issue of fact as to [the Department's] strict liability for" the alleged harassment. *Montgomery*, 626 F.3d at 390–91 (emphasis in original).

Second, Muntean does not raise a genuine dispute of fact that could lead a reasonable jury to conclude that the Department was negligent in discovering or remedying any harassment by her coworker, Martinez. To do so, she must present evidence that the Department "failed to have and enforce a reasonable policy for preventing harassment." *Montgomery*, 626 F.3d at 391 (cleaned up). "As part of this showing, [Muntean] must demonstrate that [s]he made a concerted effort to inform [the Department] of the … harassment [s]he was allegedly experiencing or that the harassment was sufficiently obvious to put [the Department] on constructive notice." *Id.* "Without employer knowledge of harassing conduct, the law does not require an employer to do more than promote general anti-harassment policies and training to ensure compliance with Title VII." *Rhodes*, 359 F.3d at 507.

Muntean does not dispute that the Department maintained antidiscrimination policies, including a policy prohibiting harassment and instructing employees how to report harassment. Pl.'s Resp. to DSOF ¶ 23; Crivlare-Maglio Decl. ¶¶ 6–7; R. 62-8, Def.'s Exh. 8, Antidiscrimination Policies. Nor does she dispute that she had access

to these policies during her employment. Pl.'s Resp. to DSOF ¶ 24; Crivlare-Maglio Decl. ¶¶ 7–13. But Muntean contends that the Department failed to enforce the harassment policy because it knew about—and failed to respond to—Martinez's conduct. *See* Pl.'s Resp. Br. at 6. Specifically, Muntean testified in her deposition that (1) she told Crivlare-Maglio, the EEO office, two security guards, and her coworker, Darius, about Martinez' s harassment before her resignation; and (2) several of her interactions with Martinez in the office were loud enough that Crivlare-Maglio should have been on notice about the harassment. *Id.*; Def.'s Resp. to PSOF ¶ 65; Muntean Dep. at 38:18–39:1, 41:11–17.

"Where an employer designates a 'point person' to accept complaints" about harassment, "this person becomes the natural channel for the making and forwarding of complaints, and complainants can be expected to utilize it in the normal case." *Hall v. Bodine Elec. Co.*, 276 F.3d 345, 356 (7th Cir. 2002) (cleaned up), *overruled on other grounds by Hill v. Tangherlini*, 724 F.3d 965, 967 n.1 (7th Cir. 2013). Here, the Department's policy instructed employees to report harassment to their supervisor, the EEO office, or an EEO officer. Antidiscrimination Policies at 16. There is no evidence that Muntean's coworker and the two security guards were supervisors or worked for the EEO office. So they were not "the type of employee who could be expected to convey [Muntean's] complaints to someone who could stop the harassment." *Montgomery*, 626 F.3d at 391 (cleaned up). Thus, Muntean's disclosure to those individuals was insufficient to inform the Department of the alleged harassment, and cannot establish the Department's negligence. *See id.*; *see also Hall*, 276 F.3d at 357 ("An

employer is not liable for co-employee … harassment when the victim, having a mechanism by which to report the harassment, fails to do so, and where the record is devoid of any credible evidence that the employer *should have known* that the harassment was taking place." (emphasis in original)).

In contrast, the Department might be negligent if it failed to act after Muntean reported Martinez's conduct to Crivlare-Maglio (she was a supervisor) or to the EEO office. Muntean repeatedly testified in her deposition that she reported Martinez's harassment to Crivlare-Maglio and the EEO office before her resignation on June 10, 2022. Def.'s Resp. to PSOF ¶ 65; Muntean Dep. at 41:11–17, 63:1–21, 76:13–78:5, 81:6–20, 120:14–21, 121:16–122:4. But Muntean unfortunately offers no foundation for her testimony. It would not take much to lay a foundation, but Muntean merely states that she reported the harassment to Crivlare-Maglio (during an in-person conversation) and the EEO office (over the phone or by email) some time before her resignation. Def.'s Resp. to PSOF ¶ 65; Muntean Dep. at 63:1–21, 81:6–20, 120:14–21, 121:16–122:4. But she offers no concrete details required to lay a foundation: Muntean cannot recall when she made these reports, and she cannot provide even a rough estimate of the date or month or even the time of *year*. Muntean Dep. at 63:1–21. Muntean does not remember the name of the EEO employee with whom she communicated. *Id.* at 63:18–21. And she offers no further detail about the contents of these conversations or what she reported. *Id.* at 121:7–15, 122:2–4. Muntean also fails to provide any documentary evidence to lay a foundation for her testimony, such as EEO records of reports that she made before her resignation. *See generally* Pl.'s Resp. Br.

Without some even generalized idea of the who, what, and when of the alleged complaints, Muntean's testimony lacks foundation, is inadmissible, and cannot be considered to raise a genuine dispute of fact at summary judgment. *See Campbell v. Fasco Indus., Inc.*, 861 F. Supp. 1385, 1394 (N.D. Ill. 1994).

It is true that Muntean did complain about "bullying" and "harassment" to Crivlare-Maglio in her June 9, 2022, sick-day email. Pl.'s Resp. to DSOF ¶ 16; 06/09/2022 Emails. But in that email, Muntean did not specify that she was experiencing harassment because of her national origin or sex. *See* 06/09/2022 Emails. She did not even identify the specific harasser (Martinez). *Id.* Because Muntean made only "vague" complaints—rather than a "clear[] and direct[]" report of the alleged harassment—her sick-day email was inadequate to put Crivlare-Maglio on notice. *Montgomery*, 626 F.3d at 391–92.

Finally, Muntean also fails to raise a genuine dispute over whether Crivlare-Maglio had constructive notice of Martinez's harassment before her resignation. Muntean testified in her deposition that one of the instances of harassment—when Martinez tried to write "PR" on her arm—generated loud laughter from Martinez and another coworker, such that others in the office could have overheard. Def.'s Resp. to PSOF ¶ 58; Muntean Dep. at 38:13–39:3. But she offers no evidence that Crivlare-Maglio was nearby or otherwise in a position to overhear the harassment, let alone that Crivlare-Maglio actually did overhear it. Even if she had, overhearing a single incident would likely not be enough for a reasonable jury to conclude that Crivlare-Maglio was on notice that Martinez was severely, regularly harassing Muntean.

Thus, Muntean "has failed to set forth sufficient evidence that the harassment was so pervasive and obvious that [the Department] must be charged with constructive knowledge." *Rhodes*, 359 F.3d at 507.

Instead, the record shows that Crivlare-Maglio was not aware of the alleged harassment until June 10, 2022, when Muntean emailed her resignation letter detailing her allegations against Martinez. Pl.'s Resp. to DSOF ¶ 26; Resignation Letter; Crivlare-Maglio Decl. ¶ 24. At that point, the Department responded immediately and appropriately by investigating Muntean's allegations, ordering Martinez not to contact Muntean, and placing Martinez on leave. Pl.'s Resp. to DSOF ¶¶ 31, 37–38; D'Ascenzo Decl. ¶¶ 5–7; 06/13/2022 No Contact Email; 06/13/2022 Leave of Absence Letter. The Department could not do more to directly remedy Muntean's situation—in other words, to ensure that she could continue to work for the Department without harassment—because she had already resigned and refused to participate in the EEO office's investigation. Pl.'s Resp. to DSOF ¶¶ 33, 35–36, 40; D'Ascenzo Dep. at 41:5–16, 114:9–115:12; D'Ascenzo Decl. ¶ 10. Because the undisputed evidence shows that the Department addressed Muntean's harassment claims once she reported them, a reasonable jury could not conclude that the Department was negligent. *See Rhodes*, 359 F.3d at 507; *Hall*, 276 F.3d at 356–57.

Separate from Muntean's experiences, she notes that the Department also received complaints from other women about Martinez's behavior. Def.'s Resp. to PSOF ¶¶ 74–75, 78–79; D'Ascenzo Dep. at 47:15–48:4, 65:22–66:13, 78:3–79:10. But again, once the Department was aware of these complaints, it took action to investigate

them. D'Ascenzo Dep. at 47:4–48:4, 60:6–61:14, 76:18–79:17. Indeed, the evidence about these complaints comes from the deposition of D'Ascenzo, an EEO officer, who described her office's investigation of the complaints. *See id.* Viewed in this context, no reasonable jury could conclude that the Department was negligent in responding to the other employees' complaints about Martinez.

In the next part of the Opinion, the Court concludes that Martinez's harassment of Muntean was not severe or pervasive, nor was it because of Muntean's national origin. Those are also grounds for granting summary judgment to the Department on Muntean's hostile work environment claims. But to reiterate, even if Muntean could raise a genuine dispute on those issues, she cannot provide any evidence that would lead a reasonable jury to find that the Department was negligent in addressing Martinez's conduct. Thus, Muntean fails to raise a genuine issue of fact as to employer liability, and the Department is entitled to summary judgment on Muntean's hostile work environment claims premised on Martinez's conduct. *See Montgomery*, 626 F.3d at 392–93.

**2. Severe or Pervasive**

To overcome summary judgment, Muntean must also raise a genuine dispute of fact on whether Ahmed's and Martinez's harassment was severe or pervasive. "To constitute *actionable* … harassment, the activity must be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Sanchez v. El Milagro, Inc.*, 176 F.4th 961, 968 (7th Cir. 2026) (cleaned up) (emphasis in original). To determine whether conduct was severe or

pervasive, the Court views the evidence in Muntean's favor and considers the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 969 (cleaned up).

Ahmed's conduct comes nowhere close to meeting this standard. Muntean says that Ahmed yelled at her on one occasion shortly before she resigned. Def.'s Resp. to PSOF ¶ 50; Muntean Dep. at 33:4–13, 34:1–4, 36:15–18. Muntean also testified that she witnessed Ahmed yell at her other coworker, Darius, who is also Romanian. Def.'s Resp. to PSOF ¶ 51; Muntean Dep. at 34:12–18, 36:11–12. And Muntean described a few other occasions where she and Ahmed would disagree about how to enter an unemployment claim, and Muntean believed that Ahmed's approach was fraudulent. Def.'s Resp. to PSOF ¶ 69; Muntean Dep. at 49:22–51:14. But "supervisors may be short tempered, hostile, unfairly critical, and disrespectful without creating a workplace permeated with discriminatory intimidation, ridicule, and insult." *Jones v. Das*, 164 F.4th 1024, 1034 (7th Cir. 2026) (cleaned up). Even taking the evidence in the light most favorable to Muntean, Ahmed's behavior amounts to "the sort of relatively minor slights that … do not amount to severe or pervasive harassment." *Id.*

As for Martinez, the Court has already concluded that the Department is not liable for his conduct (because he was not a supervisor and the Department was not negligent in responding to his harassment). But even if the Department could be held responsible for Martinez's conduct, it was not severe or pervasive. To start, "hostile

work environment claims require that the facts be assessed through *both* a subjective and objective lens." *Sanchez*, 176 F.4th at 969 (emphasis in original). No one disputes that Muntean subjectively perceived Martinez's conduct to be abusive. Def.'s Resp. to PSOF ¶ 59; Muntean Dep. at 40:5–18. But his conduct must also be *objectively* severe or pervasive, such that "a reasonable person would find it offensive in the workplace." *Sanchez*, 176 F.4th at 969. Martinez made several sexual comments to Muntean that were clearly inappropriate. *See* Def.'s Resp. to PSOF ¶¶ 62–64; Muntean Dep. at 66:1–20, 68:7–18, 117:18–22. Although "unfortunate, such off-color comments, isolated incidents, teasing, and other unpleasantries are not enough for a Title VII sexual harassment claim." *Anderson v. Mott Street*, 104 F.4th 646, 652 (7th Cir. 2024) (cleaned up). The several comments that Martinez made were inappropriate, but not so severe or frequent that they created a hostile work environment.

Some of Martinez's harassment also included physical acts, Def.'s Resp. to PSOF ¶¶ 57, 60–61; Muntean Dep. at 38:13–39:3, 39:13–19 (trying to write "PR" on Muntean's arm); Muntean Dep. at 44:5–10 (placing his head on Muntean's shoulder); Muntean Dep. at 64:6–19 (groping Muntean's shoulder), which are generally "considered more severe than harassing comments alone," *Sanchez*, 176 F.4th at 969 (cleaned up). But again, the few isolated instances of inappropriate touching—as disgraceful as they were—lack the frequency and severity necessary to establish an actionable hostile work environment. *See Anderson*, 104 F.4th at 652 (holding that conduct was not severe or pervasive where a coworker touched the plaintiff inappropriately three or four times).

Muntean again notes that other women in the Department complained that Martinez had exhibited similarly inappropriate behavior towards them. *See* Pl.'s Resp. Br. at 5; Def.'s Resp. to PSOF ¶¶ 74–75, 78–79; D'Ascenzo Dep. at 47:15–48:4, 65:22–66:13, 78:3–79:10. But Muntean offers no evidence that she personally witnessed these events, so they did not affect the conditions of *her* employment. *See Paschall v. Tube Processing Corp.*, 28 F.4th 805, 815 (7th Cir. 2022). Thus, Muntean fails to offer evidence that would allow a reasonable jury to find that Martinez's conduct was so severe or pervasive that it is actionable under Title VII.

**3. National Origin or Sex**

Muntean also fails to offer evidence that would allow a reasonable jury to find that Martinez harassed her because of her national origin, or that Ahmed harassed her because of either her national origin or sex. As to Martinez, the only evidence that Muntean identifies is the incident where Martinez tried to write "PR," or "Puerto Rico," on her arm. Pl.'s Resp. Br. at 3–4; Def.'s Resp. to PSOF ¶ 57; Muntean Dep. at 38:13–39:3, 39:16–17. But Muntean is Romanian, not Puerto Rican. Pl.'s Resp. to DSOF ¶ 2; Muntean Dep. at 14:4–5. So this incident could not lead a reasonable juror to think that Martinez was harassing Muntean because she was Romanian. Perhaps it is possible that a mistaken perception of national origin could form the basis of a valid discrimination claim, but Muntean does not argue that theory here. And none of the other incidents had anything to do with Muntean's national origin. *See* Def.'s Resp. to PSOF ¶¶ 62–64; Muntean Dep. at 66:1–20, 68:7–18, 117:18–22 (describing Martinez's comments about sex and relationships). Thus, Muntean does not raise a

genuine dispute of fact on this issue. *See Zayaz v. Rockford Mem'l Hosp.*, 740 F.3d 1154, 1159 (7th Cir. 2014).

Similarly, no evidence in the record could lead a reasonable jury to conclude that Ahmed's conduct was because of Muntean's national origin or sex. As an initial matter, the parties dispute whether Ahmed even knew that Muntean was Romanian. Ahmed testified in her deposition that she does not remember if she knew Muntean's national origin at the time. Pl.'s Resp. to DSOF ¶ 6; Ahmed Dep. at 19:2–6. But Muntean recalls that on her first day of work, she spoke with Ahmed and Martinez about her tattoo of the Romanian Orthodox cross. Def.'s Resp. to PSOF ¶ 55; Muntean Dep. at 37:11–18. This conversation raises a genuine dispute about whether Ahmed knew Muntean's national origin when they worked together.

But even if Ahmed knew that Muntean was Romanian, there is no evidence that Ahmed yelled at Muntean *because of* her national origin. The contents of Ahmed's comments had nothing to do with Muntean's national origin. *See Paschall*, 28 F.4th at 814. Although "such a connection does not have to be explicit, there must be *some* connection." *Zayas*, 740 F.3d at 1159 (emphasis in original). Yet the only connection Muntean offers is her testimony that Ahmed yelled at her and her Romanian coworker, Darius. Pl.'s Resp. Br. at 3–4; Def.'s Resp. to PSOF ¶ 51; Muntean Dep. at 34:12–18, 36:11–12. That assertion alone, without any foundation or context, cannot raise a genuine dispute of fact about Ahmed's motivations. Muntean offers no concrete facts that would raise an inference that Ahmed treated Muntean and Darius differently because of their national origin. For instance, Muntean did not testify that

Ahmed failed to reprimand other, non-Romanian employees who made the same mistakes in their work. *See Paschall*, 28 F.4th at 813–14. Thus, Muntean fails to show that a reasonable jury could conclude that Ahmed yelled at her because of her national origin.[4]

So, too, with Muntean's other protected characteristic, sex. Again, none of Ahmed's comments had anything to do with the fact that Muntean is a woman. And again, Muntean asserts—without any foundation or concrete supporting facts—that Ahmed yelled at her, but not at male employees. Def.'s Resp. to PSOF ¶ 52; Muntean Dep. at 58:13–23. Without further detail, it would be impossible for a reasonable jury to conclude that Ahmed yelled at Muntean because she is a woman. For instance, Muntean did not testify that she witnessed Ahmed speak with men in the office, but refrain from yelling at them when they made the same errors as Muntean. So Muntean also fails to raise a genuine dispute of fact about whether Ahmed's alleged harassment was because Muntean is a woman.

**4. Affirmative Defense**

Even if Muntean offered evidence that could lead a reasonable jury to conclude that Ahmed was a supervisor, that she harassed Muntean because of her national

[4]Muntean also references a suit brought by a member of the public who felt they were treated differently by the Department because of their race. Pl.'s Resp. Br. at 3–4; Def.'s Resp. to PSOF ¶ 54; Muntean Dep. at 35:10–21. When discussing the suit at work one day, Mona commented that the office was "racist." Def.'s Resp. to PSOF ¶ 54; Muntean Dep. at 35:10–21. But this comment, made in a completely different context about a different issue, would not allow a reasonable jury to conclude that Ahmed yelled at Muntean because she is Romanian.

origin or sex, and that Ahmed's conduct was severe or pervasive, Muntean would lose on the *Faragher-Ellerth* affirmative defense. "An employer may escape liability" for a supervisor's harassment "if it can show the hostile work environment was not accompanied by an adverse employment action and prove an affirmative defense." *Hunt v. Wal-Mart Stores, Inc.*, 931 F.3d 624, 627–28 (7th Cir. 2019). The Department meets the first element: as described in other parts of this Opinion, Muntean experienced no adverse employment action because she did not experience an actionable hostile work environment and was not constructively discharged. *See supra* Section III.A.2; *infra* Section III.B.

The Department invokes the *Faragher-Ellerth* affirmative defense for the second element, which "requires the employer to prove by a preponderance of the evidence that: (1) it exercised reasonable care to prevent and correct promptly any … harassing behavior, and (2) the plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to otherwise avoid harm." *Hunt*, 931 F.3d at 628; *see* Def.'s Br. at 12–13. As described earlier in the Opinion, the Department had antiharassment policies in place, and it took immediate action to investigate Muntean's harassment claims once she reported them, but Muntean refused to participate in the investigation. *See supra* Section III.A.1. Muntean does not genuinely dispute these facts; she does not even address this issue in her response brief. *See generally* Pl.'s Resp. Br.; *see* R. 74, Def.'s Reply Br. at 7. Thus, the Department is also entitled to summary judgment on the hostile work environment claims for Ahmed's conduct on this affirmative defense.

In sum, Muntean fails to resist summary judgment on her hostile work environment claims for numerous reasons. She does not raise a genuine dispute of fact that would allow the jury to conclude that the Department is liable for Martinez's harassment. And even if she did, a reasonable jury could not conclude that Martinez's harassment was severe or pervasive, nor that it was because of her national origin. Similarly, Muntean fails to offer evidence that Ahmed's conduct was severe or pervasive, or because of her national origin or sex. And even if she did, the Department is not liable for her conduct because it could successfully invoke the *Faragher-Ellerth* affirmative defense. For all of these reasons, the Department is entitled to summary judgment on Muntean's hostile work environment claims.

**B. Constructive Discharge**

Muntean also contends that she was constructively discharged because of her national origin and sex. Pl.'s Resp. Br. at 7. "An employee is constructively discharged when, from the standpoint of a reasonable employee, the working conditions become unbearable." *Kedas v. Ill. Dep't of Transp.*, 149 F.4th 951, 957 (7th Cir. 2025). The Seventh Circuit has recognized two types of constructive discharge: (1) when "the employee resigns because of discriminatory working conditions even more egregious than that required for a hostile work environment claim;" and (2) when an employer acts in a manner that would make clear to a reasonable employee that [she] will be immediately fired if [she] does not resign." *Id.* (cleaned up).

The latter type of constructive discharge does not apply here. Indeed, D'Ascenzo went so far as to encourage Muntean to rescind her resignation. Pl.'s Resp. to

DSOF ¶¶ 32, 34; 06/13/2022 D'Ascenzo Email; 06/12/2022 D'Ascenzo Email. So no reasonable employee in Muntean's shoes would believe that she would be immediately fired if she had not resigned. For the former type of constructive discharge, Muntean cannot show that her working conditions were "more egregious than a hostile work environment." *Kedas*, 149 F.4th at 957. As described earlier in this Opinion, the alleged harassment Muntean faced was not so severe or pervasive that it created an actionable hostile work environment claim. *See supra* Section III.A.2. Because no reasonable jury could conclude that Muntean was constructively discharged, the Department is entitled to summary judgment on her claims of national-origin and sex discrimination.

**C. Retaliation**

"To prevail on a Title VII retaliation claim, the plaintiff must prove that (1) [s]he engaged in an activity protected by the statute; (2) [s]he suffered an adverse employment action; and (3) there is a causal link between the protected activity and the adverse action." *Lewis v. Wilkie*, 909 F.3d 858, 866 (7th Cir. 2018). Muntean can either directly or indirectly show these elements. *See id.* Either way, she must offer evidence that could lead a reasonable jury to find that she suffered an adverse employment action. *See id.* But because Muntean has no actionable hostile work environment claim, nor was she constructively discharged, she suffered no adverse action. *See supra* Sections III.A–B. For that reason alone, her retaliation claim fails.

What's more, even if Muntean's resignation could be considered a constructive discharge, she cannot show any causal connection to her protected activity. As

discussed earlier in this Opinion, Muntean did not inform Crivlare-Maglio that she was being harassed because of her national origin and sex until she emailed her resignation letter. *See supra* Section III.A.1; *see also* Pl.'s Resp. to DSOF ¶ 26; Resignation Letter; Crivlare-Maglio Decl. ¶ 24. Muntean's earlier complaints were either not to Crivlare-Maglio or did not convey that she was experiencing harassment *because of* her national origin and sex. Pl.'s Resp. to DSOF ¶ 16; 06/09/2022 Emails; Def.'s Resp. to PSOF ¶ 65; Muntean Dep. at 41:11–17. So the resignation letter is the only action that can constitute protected activity. *See Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006) (describing how a plaintiff engages in protected activity only when they complain about "discrimination or harassment" in "connection to a protected class or provid[e] facts sufficient to create that inference"); *Durkin v. City of Chicago*, 341 F.3d 606, 614 n.4 (7th Cir. 2003) (describing how it is implicit in the protected-activity element that the employer must know about the protected activity). But Muntean's complaint occurred simultaneously with her resignation. Because there was no time between Muntean's protected activity and her resignation, no reasonable jury could find that she was constructively discharged in retaliation for her protected activity. In other words, by the time Muntean took the protected activity, she had already resigned, and could not be retaliated against. Thus, she has failed to offer any evidence of causation. The Department is also entitled to summary judgment on Muntean's retaliation claim.

## IV. Conclusion

The Department's motion, R. 60, is granted. Final judgment shall be entered dismissing the case.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: September 4, 2026